IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO.  5:15-CV-37-FL

| | | |
|---|---|---|
| ARROW ENTERPRISE COMPUTING SOLUTIONS, INC., a Delaware corporation, | ) ) ) ) | |
| Plaintiff, | ) ) | ORDER |
| v. | ) ) | |
| BLUEALLY LLC, a Delaware limited liability company; BLUEALLY DIRECT, LLC, a Virginia limited liability company; NET DIRECT SYSTEMS, LLC, a North Carolina limited liability company; PHILIP ALBERT SANTONI, an individual; and CRISTA MARIE SANTONI, an individual, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

This matter comes before the court on plaintiff's motion for summary judgment (DE 91) and motion to seal (DE 96).  After briefing on the summary judgment motion was stayed to permit a period of additional discovery, defendants BlueAlly, LLC ("BlueAlly") and BlueAlly Direct, LLC ("BlueAlly Direct") (collectively, the "BlueAlly defendants"), filed a response thereto, and plaintiff replied.  In this posture, the issues raised are ripe for ruling.  For the following reasons, the court grants in part plaintiff's motion for summary judgment on certain determinations of law as set forth herein, and denies the motion in remaining respects.  The court also grants in part and denies in part plaintiff's motion to seal as set forth herein.

## STATEMENT OF THE CASE

Plaintiff commenced this action on January 22, 2015, and filed second amended complaint on March 25, 2015, asserting claims for breach of contract and anticipatory breach against the BlueAlly defendants, and asserting additional claims for breach of contract and unjust enrichment against defendant Net Direct Systems LLC ("Net Direct"), as well as claims for breach of guaranty and promissory estoppel against defendants Philip Albert Santoni ("Philip Santoni") and Crista Marie Santoni ("Crista Santoni") (together, the "Santonis"). Plaintiff seeks compensatory and consequential damages, including lost profits.

The BlueAlly defendants moved to dismiss for failure to state a claim on April 13, 2015. This court denied the motion on October 22, 2015, and the BlueAlly defendants filed their answer with affirmative defenses on November 3, 2015. The court entered default as to defendant Net Direct on November 10, 2015, and as to the Santonis on December 18, 2015.

A period of discovery followed, extended several times by amended case management orders, most recently with fact discovery concluding December 16, 2016, and expert discovery concluding February 20, 2017. On November 18, 2016, the BlueAlly defendants filed a motion to compel discovery, which was granted in part and denied in part by magistrate judge on March 3, 2017. The BlueAlly defendants appealed that decision on March 17, 2017, and, while that appeal was ripening, plaintiff filed the instant motion for summary judgment and motion to seal. The court stayed briefing on the motion for summary judgment pending outcome of the appeal. On April 20, 2017, the court affirmed in part and reversed in part the order of magistrate judge, directed production of certain documents, and provided a schedule for lifting of stay and briefing on the summary judgment motion.

Plaintiff seeks summary judgment on its breach of contract claim against defendant BlueAlly, asking for an award of damages in the amount of $7,917,147.00, with an award of costs and attorneys' fees in an amount subsequently to be determined.[1] In support of its motion, plaintiff filed a memorandum, a statement of facts, and an appendix containing a "Letter Agreement" (hereinafter the "Letter Agreement" (DE 94-2)), executed by defendant BlueAlly and defendant Net Direct, upon which plaintiff bases its breach of contract claim against defendant BlueAlly, as well as several additional agreements and contractual documents, including:

1)   An October 13, 2010, "Security Agreement" (hereinafter, the "Security Agreement") (DE 94-21);

2)   A February 6, 2013, "Letter of Intent" (hereinafter, the "Letter of Intent") (DE 95);

3)   An August 8, 2013, "Asset Purchase Agreement" (hereinafter, the "Asset Purchase Agreement") (DE 95-2; 95-1);

4)   An October 17, 2013, "Guaranty" (hereinafter, the "Guaranty") (DE 94-25);

5)   An October 28, 2013, "Consent to Asset Purchase Agreement" (hereinafter, the "Consent") (DE 94-3); and

6)   An October 28, 2013, "Promissory Note" (hereinafter, the "Promissory Note") (DE 94-15).

In addition, plaintiff includes in its appendix email correspondence by corporate officers, excerpts of depositions of corporate officers, an expert report regarding damages (hereinafter "Expert Report"), as well as discovery responses and other documentation relating to certain transactions involving the parties. (See DE 94, 95). In opposition to the motion for summary judgment, the

---

[1] In its motion and memorandum in support thereof, plaintiff seeks summary judgment only on plaintiff's "breach of contract" claim, which is the first cause of action in the complaint, against defendant BlueAlly. It does not seek summary judgment expressly on plaintiff's claim against defendant BlueAlly for "anticipatory breach of contract," which is the third cause of action in the complaint. Nor does plaintiff seek summary judgment on these claims against defendant BlueAlly Direct. Accordingly, the court addresses solely plaintiff's claim for breach of contract against defendant BlueAlly in this order.

BlueAlly defendants rely on the same Letter Agreement and other agreements and contractual documents attached to plaintiff's appendix, along with additional excerpts of depositions of corporate officers and plaintiff's expert, as well as additional email correspondence and corporate documentation. (See DE 108, 109). In reply, plaintiff relies upon exhibits previously attached to its appendix, as well as an additional excerpt of deposition of a corporate officer. (See DE 115-1).

## STATEMENT OF UNDISPUTED FACTS

"[Plaintiff] is a global distributor in the IT market, specializing in providing enterprise and midrange computing products, services, and solutions to value-added resellers, system integrators, and independent software vendors." (Pl's Statement of Facts (DE 93) ¶ 1).[2] "[Plaintiff] began supplying computing products to [defendant] Net Direct in 2000." (Id. ¶ 2). "During the course of their business dealings, Arrow advanced funds and made loans to [defendant] Net Direct." (Id.).

On October 13, 2010, defendant Net Direct entered into the Security Agreement with plaintiff, in connection with plaintiff's extension of credit to defendant Net Direct, granting plaintiff "a lien on and security interest in all assets" of defendant Net Direct specified in Schedule A to the Security Agreement, including "[a]ll personal property and fixtures . . . of every kind and description, tangible or intangible, and all goods, equipment, furniture, inventory, accounts, contract rights, chattel paper, notes receivable, instruments [or] documents." (Security Agreement (DE 94-21) at 2, 5).[3] The Security Agreement provides that defendant Net Direct, designated as "Debtor," "will either join with or hereby allows [plaintiff] in executing [sic] one or more financing statements

---

[2]   Undisputed facts are drawn in some instances from those portions of plaintiff's statement of facts that are admitted or undisputed by the BlueAlly defendants. (See BlueAlly Defendants' Statement of Facts (DE 107)).

[3]   Page numbers specified in citations to the record in this order refer to the page number of the document designated in the court's electronic case filing (ECF) system, and not to page numbering, if any, specified on the face of the underlying document.

[hereinafter the "Financing Statement(s)"][4]  pursuant to the Uniform Commercial Code or other notices appropriate under applicable law in a form satisfactory to [plaintiff]." (Id.).  One item of default under the Security Agreement is that "[d]ebtor ceases operations, is dissolved, terminates its existence, does or fails to do anything that allows Obligations to become due before their stated maturity, or becomes insolvent or unable to meets its debts as they mature." (Id. at 3).

In early 2013, defendant BlueAlly and defendant Net Direct engaged in negotiations for BlueAlly to acquire Net Direct.  (Pl's Statement of Facts (DE 93) ¶ 4).  The February 6, 2013, Letter of Intent, negotiated by these parties, provides that defendant Net Direct "shall merge into BlueAlly . . . with BlueAlly being the surviving entity," on terms set forth in the Letter of Intent, including "[u]pon consummation of the merger the separate existence of [Net Direct] shall cease." (Letter of Intent (DE 95) at 2).

On August 8, 2013, defendant Net Direct entered into the Asset Purchase Agreement with defendant BlueAlly Direct, which executed the Asset Purchase Agreement as follows:

**BUYER:**

**BlueAlly Direct, LLC,**
**A Virginia Limited Liability Company**
By: Blue Ally, LLC, its sole member

By: _____

Name: _____ VIJAY K. TANAMALA.

Title : _____ CEO.

---

[4]  The Financing Statement(s) referenced in and associated with the Security Agreement are not in the record.

(Asset Purchase Agreement (DE 95-2) at 21). Defendant Philip Santoni, designating his title as "President," executed the Asset Purchase Agreement on behalf of defendant Net Direct. (Id.).

In the Asset Purchase Agreement, BlueAlly Direct agreed to purchase "certain of [Net Direct's] assets," and Net Direct agreed to sell "certain assets used in its business," as defined in the Asset Purchase Agreement. (Id. at 3). In particular, the Asset Purchase Agreement provided for purchase and sale of assets as follows:

### 1.1 Purchase and Sale of Assets.

(a) Subject to Section 1.2 and all other provisions of this Agreement, Buyer hereby purchases from Seller, and Seller hereby sells, transfers, assigns, conveys, and delivers to Buyer all of Seller's legal and beneficial right, title, and interest in and to all of Seller's assets, including all intangibles, listed on Schedule 1.1 and described herein, associated with the Business ("Purchased Assets"), free and clear of all liens, claims, encumbrances, mortgages, pledges, security interests, covenants, conditions, and restrictions of any kind or nature whatsoever, as evidenced, in part, by Exhibit E: Written Consent of Seller's Secured Creditors and Exhibit F: Account Balance Confirmation Statement.

(Id. at 3). Assets listed in Schedule 1.1 include approximately 75 "vendors," among which plaintiff was one listed; approximately 700 "customers"; and office equipment, inventory, and certain other items. (Asset Purchase Agreement, Schedules (DE 95-1) at 22-38).[5] Assets excluded are "Cash on Hand," "Accounts Receivable," "Prepayments," "Claims," and "Taxes." (Asset Purchase Agreement (DE 95-2) at 4-5). Among other provisions, the Asset Purchase Agreement provides that "Promptly following the Closing, Seller will provide Buyer with documents . . . evidencing the release of UCC

---

[5]  The executed copy of the Asset Purchase Agreement (DE 95-2) does not include the schedules thereto; however, an unexecuted copy of the Asset Purchase Agreement (DE 95-1) includes the schedules.

liens, and any other liens pursuant to any Security Agreements, held by Arrow Electronics, Inc.,

Arrow Enterprise Computing Solutions, Inc. and Paragon Commercial Bank." (Id. at 4).

The Asset Purchase Agreement also sets forth assumed liabilities and excluded liabilities

including the following referencing "Arrow Electronics, Inc. and/or its affiliates":

> (c)     Excluded Liabilities. Except for the Assumed Liabilities, Buyer shall not be liable or obligated for any of Seller's past, present, or future debts, obligations or liabilities, and nothing in this Agreement shall be construed in any manner to constitute an assumption by Buyer of any such debts, obligations or liabilities of Seller (collectively "Arrow"), including Seller's outstanding prebate liability to Arrow Electronics, Inc. and/or its affiliates, which approximates $2,000,000 (two million dollars). Seller shall retain and pay and perform when due all of its debts, obligations, and liabilities, secured or unsecured, whether known or unknown, asserted or unasserted, absolute, accrued, contingent, or otherwise, and whether due or to become due (collectively, "Excluded Liabilities").

(Id. at 5).    Further referencing "Arrow," the Asset Purchase Agreement includes the following

provision regarding defendant Net Direct's supplier agreements and related loan agreements:

> (d)     Arrow Electronics, Inc. Supplier and Loan Agreements.     Buyer acknowledges that Seller is a party to certain supplier agreements and related loan agreements with Arrow (collectively the "Arrow Agreements") under which Seller has certain obligations and liabilities included in the Excluded Liabilities. Buyer will negotiate in good faith and use its best efforts to enter into replacement supplier agreements with Arrow on terms and conditions that will result Arrow's forgiveness of Seller's obligations and liabilities under the Arrow Agreements.

(Id. at 5-6) (page break omitted).    The Asset Purchase Agreement also sets forth conditions for

closing and post-closing covenants.    (Id. at 11, 15-17).

7

On October 17, 2013, the Santonis executed the Guaranty, "for the indebtedness of Net Direct . . . and for the benefit of [plaintiff]," reciting that defendant Net Direct "desires to obtain credit from [plaintiff]," and the Santonis "desire[] [plaintiff] to extend or maintain such credit to [Net Direct]." (Guaranty (DE 94-25) at 2). The Guaranty provides that it is to be "effective regardless of the solvency or insolvency of [Net Direct] at any time, . . . subsequent incorporation, reorganization, merger, consolidation, or other change in the composition, nature, personnel, or location of [Net Direct]." (Id.).

On October 28, 2013, plaintiff, defendant BlueAlly Direct, and defendant Net Direct, executed the Consent, reciting as follows in reference to the Financing Statement(s) and Asset Purchase Agreement:

WHEREAS, Seller and Creditor are parties to that certain Financing Statement, dated 13th day of October, 2010 (the "Financing Statement") wherein Seller agreed to provide Creditor with collateral to secure its debt with Creditor, under the terms and conditions contained therein; and

WHEREAS, Seller has entered into an agreement with BlueAlly Direct, LLC, a Virginia limited liability company ("Buyer") whereby Seller has agreed to sell certain of its contracts, business processes, personal property, and intangible assets, in its Systems Integration and Services Business, and other related assets free and clear of any lien and security interest; and

WHEREAS, pursuant to this Consent Agreement, Seller and Buyer are seeking, and Creditor has agreed, to consent to the Asset Purchase Agreement and sale to Buyer, on the below terms and conditions.

(Consent (DE 94-3) at 2). Upon these recitals, the Consent provides that plaintiff has "NO OBJECTION TO ASSET PURCHASE AGREEMENT," and that plaintiff "consents to the Asset

Purchase Agreement and sale of [Net Direct's] contracts from [Net Direct] to [BlueAlly Direct] on the terms set forth herein and in the Asset Purchase Agreement." (DE 94-3 at 2). The terms provided in the Consent included delivery to plaintiff of the Asset Purchase Agreement, and that the Consent "will not be deemed to be a waiver of any security interests [plaintiff] may have or obtain in [Net Direct], including but not limited to the Promissory Note dated 10/28/13." (Id.).

That same date, defendant Net Direct executed said referenced Promissory Note, promising to pay plaintiff $1,978,318.00, together with interest as specified in the Promissory Note. The Promissory Note provides that "the entire unpaid balance of this [Promissory Note] shall be due and payable" on the date "occurring thirty days after the fifth anniversary of the date of [the Promissory Note]," that is, November 27, 2018, or earlier upon events of default as specified in the Promissory Note. (Promissory Note (DE 94-15) at 2). The Promissory Note provides that it "is made in connection with and hereby incorporates by reference the provisions of a certain Letter Agreement between the Maker and the Holder, dated 10/28/13." (Id.).

Said Letter Agreement, incorporated by reference into the Promissory Note, is a document on its face dated October 17, 2013, but with no execution date specified. It includes a heading and introductory paragraphs on first page and top of the second page as follows:

October 17, 2013

Net Direct Systems, LLC
2524 Reliance Avenue
Apex, NC 27539


BlueAlly, LLC
1919 Gallows Road
Suite 600
Vienna, VA 22182


Re:   Letter Agreement


Dear :

We very much appreciate the opportunity to make a proposal to assist you in meeting Net Direct's procurement goals.   To that end, Arrow Enterprise Computing Solutions, Inc ("Arrow") would like to extend to you the following terms in the hope of creating a relationship we are confident will give Net Direct Systems, LLC ("Net Direct") a competitive advantage in serving your customers. Arrow and Net Direct herein referred to as the "Parties".


Outstanding Trade Notes and Forgivable Loans

Arrow is currently the holder of a trade note receivable from Net Direct, LLC with an original value of $2,034,189.91 and a remaining balance of $1,381,000 (the "Trade Note").   Additionally, Arrow and Net Direct LLC are parties to three forgivable loans for IBM, Esvn, and HP  (the "Forgivable Loans") with a combined remaining forgivable balance of $597,318.


Forgivable Promissory Note

In order to help fund the growth initiatives outlined by you and your team, Arrow is willing to combine the balances remaining on the Trade Note and the Forgivable Loans into a single forgivable promissory note in the amount of $1,978,318 (the "Promissory Note") in consideration for receiving your five year commitment to utilize Arrow as your exclusive Partner Demand Manager through which you obtain all of your requirements for any product that is available on

> Arrow's Line Card. For the purposes of this Agreement, "Arrow's Line Card" shall be defined as any product that Arrow ECS sells. Provided that we are able to achieve certain agreed upon business goals, the Promissory Note will remain interest free, and Arrow will "forgive" one-fifth of the loan amount for each year during which these goals are met. If the goals are met for five, consecutive years, Net Direct will never have to repay any portion of the loan.
>
> The business goals required for loan forgiveness are simple. If Net Direct purchases its product requirements using Arrow as its exclusive Partner Demand Manager during the five year term of the loan and if the aggregate amount of invoices paid within terms by Net Direct on or before the anniversary of:

(Letter Agreement (DE 94-2) at 2-3). The Letter Agreement then sets out certain Net Direct purchase requirements, and the rate of forgiveness of the Promissory Note, for each successive anniversary of the Letter Agreement, for a cumulative total of $141,400,000.00 in purchases over five years. (Id. at 3-4). It also states that "Net Direct will be liable to pay any and all unpaid principal amounts due under the Promissory Note to the extent not forgiven." (Id. at 4). It then includes a provision referencing the Guaranty, and it provides that its terms are "to be read in conjunction with and executed contemporaneously with the Promissory Note between the parties dated 10/28/13," also incorporated by reference into the Letter Agreement. (Id. at 3). Finally, it concludes with the following provisions:

If this proposal is agreeable to you, please indicate your acceptance of its terms by signing a copy in the space provided below and returning it to me.

By signing below, Blue Ally agrees that, to the extent it either purchases the assets of NetDirect or has any control over the Net Direct operations,

it will cause NetDirect to fulfill all purchase obligations required for forgiveness of the Promissory Note however, cannot ensure that aggregate purchases will be sufficient to result in full forgiveness of the Promissory Note

Sincerely,

Net Direct Systems, LLC,

By: _____
Name: Philip Santoni
Title:  President

Blue Ally, LLC

By: _____
Name: Clay Qarney
Title:  Chief Financial Officer

(Id. at 3-4) (page break omitted, punctuation and syntax unaltered).

On December 10, 2013, defendant BlueAlly announced in a press release (hereinafter "Press Release") that "it ha[d] finalized the acquisition of [defendant] Net Direct." (DE 94-17 at 2). The Press Release states that "[t]he [Net Direct] team will maintain their roles and continue to serve clients as BlueAlly." (Id.). Until about August 1, 2014, defendant BlueAlly Direct or defendant BlueAlly ordered computing products from plaintiff, and plaintiff forgave a portion of the amount owed under the Promissory Note, leaving a principal balance of $1,571,000.00 under the Promissory

12

Note.  (Pl's Statement of Facts (DE 93) ¶ 21; BlueAlly Defs' Statement of Facts (DE 107) ¶21; Stasiak Decl. (DE 94-20) ¶15).

On August 1, 2014, Vijay Tanamala ("Tanamala"), signing as "CEO" of defendant BlueAlly, sent an email to a group of individuals with email addresses ending in "hp.com" "blueally.com" and "Avnet.com" stating: "let this letter serve as our notification that BlueAlly, LLC wishes to transfer our HP Enterprise Distribution Agreement from Arrow ECS to Avnet Technology Solutions (Avnet)." (DE 94-26).  Plaintiff received this notification also on or about August 1, 2014.  (Stasiak Decl. (DE 94-20) ¶ 16).  Rene Stasiak ("Stasiak"), plaintiff's Director of Financial Services, states that this notification  "was a clear expression that [defendant BlueAlly] would no longer use Arrow as its exclusive provider of computing products that Arrow could sell."  (Id. ¶ 17).

Plaintiff has calculated the amount of revenue that would have been generated, but was not, due to failure by the BlueAlly defendants to purchase products from plaintiff over a five year period of time.  (See Expert Report (DE 95-6) at 15, 26).   Subtracting costs and other factors, plaintiff calculates lost profits in the amount of $7,917,147.00, as the amount of damages the BlueAlly defendants have caused due to an asserted violation of plaintiff's first and third causes of action for breach and anticipatory breach of the Letter Agreement.  (Id. at 7).  Additional potential damages arising out of the alleged breach of the Promissory Note and remaining causes of action are not included in plaintiff's $7,917,147.00 lost profits calculation.  (Id.).

## COURT'S DISCUSSION

A.    Summary Judgment

    1.    Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (internal quotation omitted). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to

be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." <u>Lovelace v. Sherwin-Williams Co.</u>, 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." <u>Myrick v. Prime Ins. Syndicate, Inc.</u>, 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. <u>Id.</u> at 489-90.

2.      Analysis

The elements of a breach of contract claim under New York law[6] are "the existence of a facially valid contract, breach and damages." <u>Mercantile & Gen. Reinsurance Co., plc v. Colonial Assur. Co.</u>, 624 N.E.2d 629, 630 (N.Y. 1993). "[W]ritten agreements are construed in accordance with the parties' intent[,] and the best evidence of what parties to a written agreement intend is what

_____

[6] Plaintiff contends that the Letter Agreement, upon which plaintiff basis its breach of contract claim, is governed by New York law because it incorporates by reference the Promissory Note, which contains a provision specifying that New York law applies. (<u>See</u> Promissory Note (DE 94-15) at 3). The BlueAlly defendants contend, by contrast, that North Carolina applies because the Letter Agreement does not itself contain a choice of law provision and it was last executed in North Carolina. The choice of law analysis in this case is complicated by the fact that defendant BlueAlly was not a party to the Promissory Note, and by the fact that the Promissory Note also incorporates by reference the Letter Agreement. (<u>See id.</u> at 2). In addition, this court previously applied North Carolina law to the Letter Agreement without analysis of choice of law. (<u>See</u> April 20, 2017, order at 8-9; Oct. 22, 2015, order at 5-12). Further, the court notes that Virginia law governs the terms of the Consent and Asset Purchase Agreement, and Colorado law governs the terms of the Security Agreement and the Guaranty. Accordingly, the court does not resolve conclusively the determination of choice of law at this juncture, but rather adopts plaintiff's suggested choice of law for purposes of the instant analysis. In any event, the parties have not identified and the court has not found, any material difference between the laws of New York, North Carolina, Virginia, and Colorado, on the issues presented by the instant motion.

they say in their writing." Schron v. Troutman Sanders LLP, 986 N.E.2d 430, 433 (N.Y.2013) (internal quotations omitted). "As such, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." Id. (internal quotations omitted).

"Parol evidence – evidence outside the four corners of the document – is admissible only if a court finds an ambiguity in the contract." Id. "Whether an agreement is ambiguous is a question of law for the courts." Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P., 920 N.E.2d 359, 363 (N.Y.2009) (quotations omitted). "The entire contract must be reviewed and particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby." Id. (quotations omitted).

"A contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for a difference of opinion." Greenfield v. Philles Records, Inc., 780 N.E.2d 166, 170-71 (N.Y. 2002). "Ambiguity in a contract arises when the contract, read as a whole, fails to disclose its purpose and the parties' intent or where its terms are subject to more than one reasonable interpretation." Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 37 N.E.3d 78, 80 (N.Y. 2015) (internal quotations omitted). "Ambiguity is present if language was written so imperfectly that it is susceptible to more than one reasonable interpretation." Brad H. v. City of New York, 951 N.E.2d 743, 746 (N.Y. 2011).

The BlueAlly defendants contend a genuine issue of material fact exists as to the validity of the contract and its terms, as well as breach and damages. The court addresses each issue in turn.

a.    Contract validity

The BlueAlly defendants argue that the Letter Agreement is not a valid contract with defendant BlueAlly because, inter alia, it is not supported by consideration. "[T]here must be consideration in contracts in order to make them valid." I. & I. Holding Corp. v. Gainsburg, 12 N.E.2d 532, 534 (N.Y. 1938). "Under the traditional principles of contract law, the parties to a contract are free to make their bargain, even if the consideration exchanged is grossly unequal or of dubious value." Apfel v. Prudential-Bache Sec. Inc., 616 N.E.2d 1095, 1097 (N.Y. 1993). "It is enough that something of real value in the eye of the law was exchanged." Id. (quotations omitted). "[T]he relinquishment of . . . rights and remedies otherwise conferred by law are . . . relevant to the determination of fair consideration." Commodity Futures Trading Comm'n v. Walsh, 951 N.E.2d 369, 377 (N.Y. 2011). For example, "relinquishment of disputed claim is valid consideration even though claim is in fact invalid," Apfel, 616 N.E.2d at 1097, or "an agreement by [a] creditor to forbear the collection of a debt presently due is a good consideration for an absolute or conditional promise of a third person to pay the debt, or for any obligation he may assume in respect thereto." Strong v. Sheffield, 144 N.Y. 392, 394, 39 N.E. 330 (1895).

Plaintiff's execution of the Consent constitutes forebearance of legal rights sufficient to qualify as consideration for a contract under law. In light of the recitals in the Consent, by withholding any objection to the Asset Purchase Agreement, plaintiff was thereby relinquishing certain rights or claims it may have had on the basis of its Security Agreement and Financing Statement(s), expressly referenced in the Consent. (Consent (DE 94-3) at 2). In particular, the Consent notes a "certain Financing Statement, dated 13th day of October, 2010," which reasonably is interpreted as a reference to the Security Agreement and Financing Statement(s). (Id.) The consent then notes that, under the Asset Purchase Agreement, defendant Net Direct agreed to sell

"certain of its assets . . . free and clear of any lien and security interest." (<u>Id.</u>).  Such Asset Purchase Agreement thus could have without plaintiff's Consent given rise to certain claims and rights under the Security Agreement and Financing Statement(s), by impacting certain Net Direct collateral and liens.  (<u>Id.</u>).  Such claims and rights may have included the ability to declare a default of the Security Agreement or to exercise all rights and remedies of a secured creditor under the Uniform Commercial Code. (<u>See</u> Security Agreement (DE 94-21) at 3).

Defendant suggests, nonetheless, that plaintiff gave up nothing through the Consent because of a caveat in the Consent (hereinafter the "caveat") that the Consent "will not be deemed to be a waiver of any security interests Creditor may have or obtain in Seller, including but not limited to the Promissory Note dated 10/28/13 associated documents." (Consent (94-3) at 2).  But, this caveat limiting the scope of the Consent is narrower than the full range of rights and claims that plaintiff was relinquishing through the Consent. Indeed the caveat does not reference back to the Financing Statement, but rather references only the newly-executed Promissory Note and associated documents.  To interpret the caveat as preserving <u>all</u> possible rights and claims plaintiff could have upon execution of the Asset Purchase Agreement would render the Consent without any force and effect.  The only reasonable interpretation of the Consent is that it did provide for some forebearance on the part of plaintiff of certain of its rights and remedies under the Security Agreement and Financing Statement(s) based upon execution of the Asset Purchase Agreement.

Having so determined, however, an issue remains whether the parties in fact intended for the Consent to be consideration for the Letter Agreement.  On this issue, the text and context of the Letter Agreement, the Consent, and related documents, provide clues, but they are reasonably susceptible to different interpretations.  On the one hand, the Consent refers to the Promissory Note and "associated documents," (Consent (DE 94-3) at 2), permitting an inference that the Consent, like

the Promissory Note, should be read as if incorporated by reference into the Letter Agreement. On the other hand, there is no statement in any of the documents that the Consent is consideration for the Letter Agreement; indeed, the Letter Agreement does not reference at all the Consent and the Consent does not reference at all the Letter Agreement. (See Consent (94-3); Letter Agreement (DE 94-2).

Plaintiff does not provide a textual argument for linking the Consent to the Letter Agreement, but rather relies upon parol evidence regarding the negotiations and circumstances of drafting. Such evidence, however, is subject to a genuine dispute of fact. For example, plaintiff cites to Stasiak's statement in his declaration that the parties to the Consent and the Letter Agreement executed such agreements "on or about" the same date. (Stasiak Decl. (DE 86-20) at 12). The BlueAlly defendants, by contrast, cite to testimony that the date of execution of the Letter Agreement is unknown. (See Tanamala Dep. (DE 108-2) at 8; Carney Dep. (DE 108-3) at 4). In addition, Clay Carney ("Carney"), one of the individuals who signed the Letter Agreement, as Chief Financial Officer of defendant BlueAlly, testified that he "just [has] a general recollection that we discussed the – the desire to obtain the Consent in order to conclude the [Asset Purchase Agreement]," and that he was not aware that "BlueAlly made any promise in return to Arrow in order to obtain this Consent." (Carney Dep. (DE 108-3) at 2).

In sum, while the Consent is sufficient to constitute consideration for a contract, there is a genuine issue of fact whether the parties intended for the Consent to serve as consideration for the Letter Agreement. Accordingly, plaintiff's motion for summary judgment must be denied for this reason on the basis of the element of contract validity.[7]

---

[7] The BlueAlly defendants suggest that plaintiff's breach of contract claim against defendant BlueAlly Direct necessarily fails for the additional reason that it is not a signatory to the Letter Agreement. Plaintiff, however, does not move for summary judgment on its claims against defendant BlueAlly Direct, and the BlueAlly defendants have not

b.      Conditions precedent

The BlueAlly defendants argue that they are not bound by any obligations in the Letter Agreement because the conditions precedent to contract formation in the Letter Agreement did not come to pass.  For the reasons set forth below, the court rejects defendants' argument as to this issue as a matter of law.  Therefore, the court grants summary judgment to plaintiff in part, as to this issue.

Defendant BlueAlly's obligations in the Letter Agreement are contingent upon two alternative conditions precedent, particularly, that defendant BlueAlly either: 1) "purchases the assets of NetDirect [sic]" or 2) "has any control over the Net Direct operations." (Letter Agreement (DE 94-2) at 4). The court need not address the second condition precedent, because there is no genuine issue of fact as to satisfaction of the first condition.  The first condition was satisfied because defendant BlueAlly "purchase[d] the assets of Net Direct" through its wholly owned subsidiary, defendant BlueAlly Direct. (Asset Purchase Agreement (DE 95-2) at 4, 21). In particular, defendant BlueAlly Direct executed the Asset Purchase Agreement "By: BlueAlly, LLC, its sole member" and by Tanamala, CEO of defendant BlueAlly. (Id. at 21).

Defendant BlueAlly argues that the court must preserve the corporate distinction between the entity BlueAlly and BlueAlly direct, and that, as a result, there is at least a dispute of fact over whether BlueAlly purchased the assets of Net Direct.  The court recognizes the general rule that "[a] corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary." Dole Food Co. v. Patrickson, 538 U.S. 468, 475 (2003); see JPMorgan Chase Bank, N.A. v. Malarkey, 884 N.Y.S.2d 787, 790 (2009) (stating same). The

---

moved for summary judgment.  Accordingly, the court leaves this issue raised for conclusive determination another day. The BlueAlly defendants also suggest that the Letter Agreement is not a valid contract because it does not meet the criteria for a "valid requirements contract" between plaintiff and the BlueAlly defendants.  (Mem. in Opp. (DE 106) at 8).  The court addresses further herein the interpretation of the material terms of the Letter Agreement and the issues of fact raised therefrom.

court need not disregard this general rule or any corporate distinctions, however, in determining as a matter of law that the first condition precedent was satisfied.

The instant issue presented in interpreting the first condition precedent is not whether the corporate distinction between BlueAlly and BlueAlly direct should be maintained for any or all other purposes, including for purposes of liability or other issues associated with the conduct of the parties, as discussed further below, but rather whether the parties, in executing the Letter Agreement intended that the first condition precedent would be satisfied upon purchase of Net Direct by defendant BlueAlly, through its wholly owned subsidiary BlueAlly Direct. Considering the language of the conditions precedent in context of the Consent and the Asset Purchase Agreement itself, there is no reasonable basis to conclude that the parties intended to exempt defendant BlueAlly from its obligations in the Letter Agreement by purchasing Net Direct through a wholly owned subsidiary rather than directly itself.

The BlueAlly defendants own admissions in the record are consistent with this interpretation of the first condition in the Letter Agreement. (See BlueAlly Defs' Statement of Facts (DE 107) ¶19 ("After execution of the Consent and the Letter Agreement, BlueAlly, through its wholly owned subsidiary BlueAlly Direct, finalized its acquisition of Net Direct's assets in the fall of 2013 . . . . RESPONSE: Admitted for purposes of the motion. Local Civil Rule 56.1(a)(2)."); BlueAlly Defs' Response to Interrogatories (DE 94-8) at 4 ("BlueAlly Direct was formed for the purpose of acquiring the Net Direct assets.")).

In sum, the court grants summary judgment in part to plaintiff solely on the legal issue that the first condition precedent in the Letter Agreement was satisfied.

c.    Interpretation

Satisfaction of the first condition precedent triggers defendant BlueAlly's promise to "cause NetDirect [sic] to fulfill all purchase obligations required for forgiveness of the Promissory Note[.]" (Letter Agreement (DE 94-2) at 5). In turn, the Letter Agreement describes "purchase obligations required for forgiveness of the Promissory Note" as follows:

> The business goals required for loan forgiveness are simple. . . . Net Direct purchases its product requirements using [plaintiff] as its exclusive Partner Demand Manager during the five year term of the loan . . . .

(Letter Agreement (DE 94-2) at 3).

The parties have suggested through their arguments on summary judgment differing interpretations of these terms of the Letter Agreement, each of which could have a material impact on the issue of breach and damages, and each of which is supported by aspects of the text and context of the Letter Agreement.  In particular, it is unclear from the terms of the Letter Agreement whether the parties intended to 1) bind defendant BlueAlly to cause only Net Direct to purchase <u>its</u> product requirements, and only those product requirements as were present at the time of the independent existence of Net Direct, from plaintiff (an interpretation favoring the BlueAlly defendants);  or 2) bind the BlueAlly defendants to cause Net Direct, and any successor BlueAlly entity, to purchase <u>their</u> product requirements, even if changing during the course of a five year term, from plaintiff (an interpretation favoring plaintiff).  Support for both interpretations may be found in the language and context of the Letter Agreement and related documents.

On the one hand, in support the interpretation favoring plaintiff, the Letter Agreement expressly incorporates the Promissory Note executed by defendant Net Direct, which contemplates five years of annual principal payments, forgivable under that time period through purchases

detailed in the Letter Agreement. (Promissory Note (DE 94-15) at 2). The Promissory Note was executed on the same date as the Consent, which also expressly references the Promissory Note, as well as the Asset Purchase Agreement. (Consent (DE 94-3) at 2). By virtue of these documents, read together, it reasonably may be inferred that the parties contemplated in the Letter Agreement that Net Direct, or whatever successor entity followed from the Asset Purchase Agreement, would have purchase requirements for any products on plaintiff's "Line Card," (Letter Agreement (DE 94-2) at 3), that could be applied to forgiveness of the Promissory Note.

This interpretation is further supported by certain aspects of the language and context of the Letter Agreement. In particular, the Letter Agreement is addressed equally and without differentiation to both defendant Net Direct and defendant BlueAlly. In its text, it uses the pronoun "you" and "your" without defining such term or specifying whether it applies only to defendant Net Direct or defendant BlueAlly or both, including where it calls for "your five year commitment to utilize Arrow as your exclusive Partner Demand Manager through which you obtain all of your requirements for any product that is available on Arrow's Line Card." (Letter Agreement (DE 94-2) at 2 (emphasis added)). It reiterates this ambiguity by stating "If this proposal is agreeable to you, please indicate your acceptance of its terms by signing a copy in the space provided below and returning it to me." (Id. at 4 (emphasis added)). In turn, the space provided below the text of the Letter Agreement provides for signatures by both defendant Net Direct and defendant BlueAlly. (Id. at 5).

On the other hand, in support of an interpretation favoring the BlueAlly defendants, the Letter Agreement does not state anywhere that it requires the BlueAlly defendants to purchase "their" needs for certain products from Arrow; rather it requires defendant Net Direct to purchase "its product requirements using Arrow as its exclusive Partner Demand." (Letter Agreement (DE

94-2) at 3 (emphasis added)).  While the Letter Agreement is addressed to both Net Direct and defendant BlueAlly, it is reasonable to interpret the initial five paragraphs of the Letter Agreement as referring to obligations and agreements of defendant Net Direct for two reasons.  First, the initial paragraph of the Letter Agreement states that "Arrow and Net Direct herein referred [sic] to as the 'Parties'" (Id. at 2),  which could be interpreted either as an imperfection in drafting or an intent to limit the purchasing obligations strictly to those of defendant Net Direct.

Second, all the paragraphs of the Letter Agreement consistently reference defendant Net Direct by name, and only defendant Net Direct, up until the last one, which then references only defendant BlueAlly and its obligations. (See Letter Agreement (DE 94-2) at 2-4). Examples of the references to Net Direct include, but are not limited to: 1) "We very much appreciate the opportunity to make a proposal to assist you in meeting Net Direct's procurement goals"; 2) "[Arrow] would like to extend to you the following terms in the hope of creating a relationship we are confident will give Net Direct . . . a competitive advantage in serving your customers"; 3) "Arrow and Net Direct LLC are parties to three forgivable loans"; 4) "If the goals are met for five, consecutive years, Net Direct will never have to repay any portion of the loan"; 5) "The Business goals required for loan forgiveness are simple[:] . . . . Net Direct purchases its product requirements using Arrow as its exclusive Partner Demand Manager"; 6) "Should Net Direct not purchase $20,000,000 in product by the first anniversary of Letter Agreement, [plaintiff] will forgive the Promissory Note at the rate of 1.5% of the first year invoiced amount . . . ."; 7) "To the extent[] Net Direct has not purchased $141,000,000 in product by the fifth anniversary of this Letter Agreement, Net Direct agrees to pay the unpaid pro-rata portion of the intended forgiven loan amount to [plaintiff]"; 8) "Net Direct agrees to keep full, clear, and accurate records of all purchases made by Net Direct for a period of five [] years." (Id. at 2-4 (emphasis added)).

The interpretation favoring the BlueAlly defendants further is supported by general Uniform

Commercial Code rules governing interpretation of requirements contracts. In particular:

> When an enterprise is sold, the question may arise whether the buyer is bound by an existing output or requirements contract. That question is outside the scope of this Article, and is to be determined on other principles of law. Assuming that the contract continues, the output or requirements in the hands of the new owner continue to be measured by the actual good faith output or requirements under the normal operation <u>of the enterprise prior to sale</u>. The sale itself is not grounds for sudden expansion or decrease.

Uniform Commercial Code § 2-306, Comment 4 (emphasis added); <u>see</u> N.Y. U.C.C. Law § 2-306

(same). In this manner, if the parties had wished to negotiate an expansion of requirements to those

of future successor entities of Net Direct, the parties could have negotiated terms to the Letter

Agreement clearly specifying language, for example, that the BlueAlly defendants were obligated

to cause defendant Net Direct, "and any successor thereto created by the Asset Purchase Agreement

to fulfill all <u>their</u> purchase requirements," but the Letter Agreement does not so specify.

In so holding, the court also rejects suggestions in the BlueAlly defendants' opposition to

summary judgment that the Letter Agreement created no obligations whatsoever on the part of

defendant BlueAlly. (<u>See</u> Mem. in Opp. (DE 106) at 8). The BlueAlly defendants contend, for

example, that they did not assume any Net Direct obligations, except as specifically identified in the

Asset Purchase Agreement. But, this argument ignores that, in the Letter Agreement, separate and

apart from the Asset Purchase Agreement, defendant BlueAlly plainly bound itself to "cause

NetDirect [sic] to fulfill all purchase obligations required for forgiveness of the Promissory Note."

(Letter Agreement (DE 94-2) at 2-5). While there is an ambiguity in the Letter Agreement, as noted

above, as to the nature and extent of those purchase obligations, the ambiguity does not extend to

the question of whether defendant BlueAlly is required by the Letter Agreement to cause Net Direct

to fulfill purchase obligations. Thus, on this limited issue of contract interpretation, plaintiff is

entitled in part to a ruling as a matter of law, and plaintiff's motion for summary judgment is granted in that limited part.

In other respects as set forth above, the Letter Agreement is ambiguous because it is susceptible, in material part, to more than one reasonable interpretation as to the issue of the nature and extent of purchase obligations. Accordingly, the court turns next to considering genuine issues of material fact arising from the parol evidence introduced and from other evidence bearing on breach, pertaining to such issue.

    d.    Parol evidence

Where the Letter Agreement is ambiguous, the court considers next whether the parol evidence in the record, viewed in the light most favorable to the BlueAlly defendants, demonstrates a genuine issue of material fact as to the interpretation of the Letter Agreement. As set forth below, it does.

For example, in support of its interpretation of the Letter Agreement, plaintiff points to a September 19, 2013, email regarding a draft of the Letter Agreement from Carney, who ultimately signed the Letter Agreement, and Stasiak, stating that "the documents are consistent with our expectations concerning exclusivity and other elements of our go forward relationship." (Sept. 19, 2013, email (DE 94-10) at 2). This email, however, viewed in the light most favorable to the BlueAlly defendants, is not determinative in resolving the ambiguities in the references to defendant Net Direct in the Letter Agreement, as discussed herein above. Indeed, the statement in the email suffers from the same degree of ambiguity as the Letter Agreement itself, by not specifying whether the BlueAlly defendants are agreeing to cause Net Direct, and any successor entity thereof, to meet their purchasing requirements through plaintiff.

Plaintiff also cites to an October 16, 2013, email from Carney to Tanamala, in which Carney states, referring to the Letter Agreement, "[t]he last paragraph refers to BlueAlly and essentially states that we'll continue to buy product through Arrow for up to 5 years so long as the [Net Direct] loan is not yet fully forgiven." (Oct. 16, 2013, email (DE 94-13) at 2) (emphasis added). This statement, while more pertinent than the September 19, 2013 email, does not conclusively resolve the ambiguity in the Letter Agreement. Viewed in the light most favorable to plaintiff, it suggests that the BlueAlly defendants understood the Letter Agreement to bind the BlueAlly defendants to fulfill all their purchase requirements for products sold by plaintiff. However, viewed in the light most favorable to the BlueAlly defendants, it is not sufficiently precise on the point of ambiguity discussed herein to resolve the issue as a matter of law. Rather, the statement is subject to competing inferences in light of all the evidence in the record, including additional evidence, as described below, regarding negotiation of a separate contractual relationship between plaintiff and defendant BlueAlly.

Such additional evidence includes a November 1, 2013, email from Carney to Tanamala containing a draft proposal for transmission to plaintiff to "understand what steps are necessary to establish and formalize a direct relationship between Arrow and BlueAlly." (Nov. 1, 2013, email (DE 72-5) at 2). A June 16, 2014, email between plaintiff's sales employees discussing plans to present BlueAlly with a volume purchase agreement, noting also "[w]e need to figure out how to separate the 'baggage' from the old Net Direct Systems with the new BllueAlly [sic] company. Obviously, our competition is treating them as a new company." (June 16, 2014, email (DE 109-1) at 2; see Steve Kane Deposition (DE 109-3) at 3-5). Viewed in the light most favorable to the BlueAlly defendants, these statements reflect an understanding that the Letter Agreement did not require the BlueAlly defendants, beyond Net Direct or its successor entities, to make all of their

purchases through plaintiff, and that a new agreement specifically setting out such obligations would be necessary.

In sum, the Letter Agreement is ambiguous in material terms leading to a genuine issue of fact as to the interpretation of the Letter Agreement, as to the issue of the nature and extent of purchase obligations under the Letter Agreement. Therefore, plaintiff's motion for summary judgment must be denied in that part on the issue of interpretation of the Letter Agreement.

        e.        Breach and damages

Because there is a genuine issue of material fact as to interpretation of the Letter Agreement, there is a genuine issue of fact as to whether and to what extent defendant BlueAlly breached its promise in the Letter Agreement and the damages, if any, resulting therefrom. In particular, the nature and extent of the breach by the BlueAlly defendants, if any, depends on whether the Letter Agreement obligates defendant BlueAlly to meet purchase requirements only of Net Direct, defendant BlueAlly Direct, some other successor entity, or defendant BlueAlly, after August 1, 2014, the date of the alleged breach by the BlueAlly defendants. (See Stasiak Decl. (DE 94-20) ¶ 16-17).

In addition, even assuming that the Letter Agreement properly is interpreted broadly to require the BlueAlly defendants to cause Net Direct and any other successor entity to meet their product requirements using plaintiff, the record permits an inference that defendant BlueAlly independently had or developed its own product requirements by August 1, 2014. Such evidence includes announcements made regarding asset purchase in December 2013, as well as evidence discussed above regarding negotiations for a volume purchase agreement between plaintiff and defendant BlueAlly. (See, e.g., Frequently Asked Questions (DE 94-18) at 2-3 ("[W]e are here to serve you, now with even more solutions and products! We will continue to connect and offer you

the latest in our product offerings, and now we have a <u>wider portfolio, which means more options for your business</u>."; "[W]e will offer existing solutions <u>as well as new solution offerings in 2014</u>"; "Moving forward, BlueAlly will honor all present pricing agreements. Future pricing will <u>continue to vary case by case</u>") (emphasis added); Press Release (DE 94-17) at 2 ("The firm will be actively adding new locations and employees in 2014, and will remain active in the acquisition space."; Nov. 1, 2013, email (DE 72-5) at 2; June 16, 2014, email (DE 109-1) at 2; <u>see</u> Steve Kane Deposition (DE 109-3) at 3-5; Tanamala Deposition (DE 108-2) at 12-13)).

Plaintiff contends that only defendant Net Direct owned a "reseller business" prior to the Asset Purchase Agreement, suggesting that any reseller business operated by the BlueAlly defendants must be attributed to defendant Net Direct. (Pl's Reply (DE 115) at 9). For example, plaintiff cites the December 10, 2013, Press Release, which states: "BlueAlly, LLC . . . announced today that it has finalized the acquisition of Net Direct Systems (NDS). The combined entity of over 400 employees and $100M revenue will operate under the BlueAlly brand." (Press Release (DE 94-17) at 2). Viewed in the light most favorable to the BlueAlly defendants, this statement permits an inference that a "combined entity" will operate following the acquisition, not that the BlueAlly Defendants will operate Net Direct's reseller business. The same is true of an undated "Frequently Asked Questions" document submitted by plaintiff. (<u>See</u> Frequently Asked Questions (DE 94-18) 2-3 ("[t]he <u>combination of</u> Net Direct Systems/BlueAlly is a strategic and beneficial move for customers. . . .") (emphasis added)).

In addition, plaintiff cites to BlueAlly discovery responses stating: 1) "BlueAlly Direct was interested in acquiring the assets of Net Direct Systems to be able to operate as a value added reseller." (Discovery Responses (DE 94-8) at 3), and 2) "[T]he BlueAlly Defendants admit that BlueAlly did not and does not sell products." (<u>Id.</u> at 5). Evidence as discussed above regarding

negotiations for a volume purchase agreement between plaintiff and defendant BlueAlly, however, permits an inference that the BlueAlly defendants developed on their own a "reseller business," with its own requirements for products sold by plaintiff, after the Asset Purchase Agreement. (See, e.g., Frequently Asked Questions (DE 94-18) at 2-3; Press Release (DE 94-17) at 2; Nov. 1, 2013, email (DE 72-5) at 2; June 16, 2014, email (DE 109-1) at 2; see Steve Kane Deposition (DE 109-3) at 3-5; Tanamala Deposition (DE 108-2) at 12-13)).

Thus, a genuine issue of fact remains as to whether and to what extent defendant Net Direct or the BlueAlly defendants in any form had "purchase obligations" and "product requirements" that continued by the time of the alleged breach in August 2014. (Letter Agreement (DE 94-2) at 3, 5). Accordingly, plaintiff has failed to demonstrate an absence of genuine issue of material fact as to defendant BlueAlly's breach of the Letter Agreement.

In addition, because there exists a genuine issue of fact as to whether and to what extent a breach occurred, there is also a genuine issue of fact as to damages or the extent thereof. The Expert Report, upon which plaintiff relies for its damages calculation, assumes a breach to the full extent alleged by plaintiff. (See, e.g., Expert Report (DE 95-6) at 7) (I have been asked to measure Arrow's Lost Profits resulting from BlueAlly's <u>alleged breach</u> of the Letter Agreement.") (emphasis added). In addition, the Expert Report calculates lost revenue based upon "purchases which BlueAlly has made from value-added distributors other than Arrow," without applying or differentiating purchasing requirements of Net Direct at the time of the Asset Purchase Agreement. (Expert Report at 10; <u>see also</u> <u>id.</u> (noting that in calculating future lost revenue from October 2016 to October 2018, the Expert Report analyzed "historical sales to Net Direct <u>and</u> BlueAlly," noting "Arrow's sales to Net Direct <u>and</u> BlueAlly from 2010 to 2013 show some volatility while showing significant growth in some years and significant losses in other years").

Therefore, plaintiff's motion for summary judgment must be denied on the issues of breach and damages.

B.     Motion to Seal

Plaintiff moves to seal the Expert Report, which concerns plaintiff's asserted damages due to the alleged breach of contract by the BlueAlly defendants. The BlueAlly Defendants do not oppose this motion.

In evaluating a motion to seal, in accordance with the mandatory procedure outlined by the Fourth Circuit in Stone v. University of Maryland, 855 F.2d 178 (4th Cir.1988), the court must first "determine [whether] the source of [the public's] right of access . . . is based on the common law or the First Amendment" with respect to each document to be sealed. Id. at 180. This is because "different levels of protection may attach to the various records and documents involved in [a] case." Id. "The common law presumes a right to inspect and copy [all] judicial records and documents," and this presumption "may be overcome if competing interests outweigh the interest in access." Id. (citing Nixon v. Warner Communications, Inc., 435 U.S. 589, 597 (1978); Rushford v. The New Yorker Magazine, Inc., 846 F.2d 249, 253 (4th Cir.1988); In re Washington Post Co., 807 F.2d 383, 390 (4th Cir.1986)).

The First Amendment guarantees a heightened presumption of access "only to particular judicial records and documents," including "documents filed in connection with [a] summary judgment motion in civil case." Id. (citing Rushford, 846 F.2d at 253). "Where the First Amendment guarantees access, . . . access may be denied only on the basis of a compelling governmental interest, and only if the denial is narrowly tailored to serve that interest." Id. (citing Rushford, 846 F.2d at 253; Press-Enterprise Co. v. Superior Court, 464 U.S. 501, 510 (1984)).

To ensure proper weighing of such interests, "a court must first give the public notice of a request to seal and a reasonable opportunity to challenge it." <u>Id.</u> at 181 (citing <u>In re Knight Publishing Co.</u>, 743 F.2d 231, 235 (4th Cir.1984)). "While individual notice is unwarranted, the court must notify persons present in the courtroom of the request, or docket it 'reasonably in advance of deciding the issue.'" <u>Id.</u> (quoting <u>Knight</u>, 743 F.2d at 235). "The court must consider less drastic alternatives to sealing and, if it decides to seal documents, must 'state the reasons for its decision to seal supported by specific findings, and the reasons for rejecting alternatives to sealing in order to provide an adequate record for review.'" <u>Id.</u>

Plaintiff contends that the Expert Report should be sealed for the following reasons:

Arrow competes in a highly competitive industry where the terms of sale are highly confidential. The Expert Report contains this commercially sensitive information regarding Arrow's business practices with one of its customers. For example, the Expert Report contains detailed information concerning Arrow's revenues, costs, and profit margin with respect to specific sales. In Arrow's industry, sales costs and profit margin information are this information is particularly sensitive and provides a competitively sensitive.

The public dissemination of the information contained in the Expert Report would blunt Arrow's competitive edge in the marketplace. For this reason, not only the costs and profit margin information, but also the Expert Report as a whole, should be sealed. . . .  The sensitive nature of this commercial material is obvious from the face of the Expert Report. If made public, Arrow's competitors would gain valuable insight into the inner workings of the company, giving them an unfair advantage in the marketplace. Additionally, public disclosure of the Expert Report would undermine Arrow's efforts at recruiting and retaining customers, as competitors would be able to use Arrow's information to outbid Arrow. The risk that a competitor might gain such an advantage is enough to justify sealing the Expert Report.

(Mot. to Seal, Mem. (DE 97) at 5-6).  These reasons given for sealing, however, only apply to portions of the Expert Report.  Significant portions of the Expert Report, particularly its narrative text, do not contain sensitive information regarding sales, costs, and profits, beyond what is already revealed in documents available publicly or in the record in this case, such as plaintiff's summary

judgment brief (e.g., DE 92 at 21), and numerous other exhibits attached to the summary judgment materials.

Accordingly, the court GRANTS IN PART and DENIES IN PART plaintiff's motion to seal. The court grants the motion insofar as the Expert Report filed at docket entry number 95-6 shall remain under seal. Plaintiff, however, is DIRECTED to file a redacted version of the Expert Report, within **14 days** of the date of this order, which redacts only those portions of the Expert Report that meet its descriptive criteria set forth above, but leaves unredacted those portions that provide information already available in the record, or to the public, or otherwise not disclosing sensitive commercial information.

In addition, the court notes that there has been no motion to seal filed regarding the remaining documents filed provisionally under seal at docket entry number 95 (see DE 95, and 95-1 through 95-5), and those filed provisionally under seal at docket entry number 109. Therefore, in accordance with section V.G. of the court's Electronic Case Filing Administrative Policies and Procedures Manual, the clerk is DIRECTED to unseal such documents (DE 95-1 through 95-5; and DE 109). Finally, where the court has not disclosed herein information subject to sealing in accordance with the foregoing, the instant order shall not be filed under seal.

## CONCLUSION

Based on the foregoing, plaintiff's motion for summary judgment (DE 91) is GRANTED IN PART on the determinations of law as set forth herein, and it is DENIED IN PART in all remaining respects. Plaintiff's motion to seal (DE 96) is GRANTED IN PART AND DENIED IN PART. As set forth herein, the Expert Report filed at docket entry number 95-6 shall remain under seal. Plaintiff, however, is DIRECTED to file a redacted version of the Expert Report, within **14 days** of the date of this order, which redacts only those portions of the Expert Report that meet the criteria

for sealing as set forth herein.  The clerk is DIRECTED to unseal documents filed at DE 95, DE 95-1 through 95-5; and DE 109.

In light of the court's decision on plaintiff's motion for summary judgment, this case now is ripe for entry of an order governing deadlines and procedures for final pretrial conference and trial on all remaining claims.  The parties are DIRECTED to confer and file within **14 days** of the date of this order a joint status report informing of 1) estimated trial length; 2)  particular pretrial issues which may require court intervention in advance of trial, if any; and 3) at least three suggested alternative trial dates.  In addition, where mediation was noted completed already on the docket, in October 2016, the parties shall specify if they wish to schedule a court-hosted settlement conference or additional alternative dispute resolution procedures in advance of trial, and if so the date for completion of such.

SO ORDERED, this the 30th day of November, 2017.


_____
LOUISE W. FLANAGAN
United States District Judge